ORIGINAL

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

SEP 2 1 2011

CLERK, U.S. DISTRICT COURT

By _____
        Deputy

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | CRIMINAL COMPLAINT |
| v. | § | |
| | § | CASE NO. 4:11-MJ -334 |
| DANIEL PATRICK MOORE (1) | § | |
| a/k/a "Danny" | § | |
| JAMES PAUL POPE (2) | § | |
| a/k/a "Pokey" | § | |
| MORGAN CLIFFORD WOOD (3) | § | |
| a/k/a "Roca Mick" | § | |

## CRIMINAL COMPLAINT

I, J. Ray Harrison, hereinafter **Complainant**, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

Beginning on or about June 22, 2007, and continuing until the date of this complaint, in the Northern District of Texas and elsewhere, **Daniel Patrick Moore**, also knew as Danny, **James Paul Pope**, also known as Pokey, and **Morgan Clifford Wood**, also known as Roca Mick, did knowingly and intentionally combine, conspire, confederate and agree together and with each other, and with other persons known and unknown, to possess with intent to distribute 50 grams or more of methamphetamine, a Schedule II Controlled Substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A),

All in violation of 21 U.S.C. §846.

1.     Complainant is a Special Agent of the Federal Bureau of Investigation (FBI). I have been so employed for approximately seven (7) years and am currently assigned to the Dallas Field Division's Fort Worth Resident Agency on a Criminal Enterprise Squad working with a Violent Crime/Gang Task Force (hereafter referred to as "the Task Force"). The Task Force is comprised of agents, investigators, and police officers from the FBI, the Drug Enforcement Administration (DEA), the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), the Arlington, Texas Police

**Moore Complaint - Page 1**

Department (APD), the Texas Department of Public Safety (TXDPS) and the Fort Worth, Texas Police Department (FWPD).

Prior to my employment with the FBI, I was employed for approximately five (5) years with the Clinton Police Department in Clinton, Mississippi. During my service as a law enforcement officer, I have participated in multiple investigations involving the unlawful distribution of illicit drugs. I have conducted or participated in physical and electronic surveillance, undercover transactions, the execution of search warrants and the debriefing of informants. Through my training, education, and experience, I have become familiar with the manner in which illicit drugs are transported, stored, and distributed and the methods of payment for such drugs. I am also familiar with the methods by which drug traffickers communicate and many of the code words commonly used by drug traffickers.

2.     The statements contained in this Complaint are based, in part, on Undercover Agents, my personal observations, and on information provided by other Special Agents of the FBI, ATF, and DEA, and officers of APD, TXDPS, and FWPD, as well as by other law enforcement agencies identified below. Statements herein are also based on information provided by cooperating sources and cooperating defendants, all of whom are believed by me to be reliable and credible. Statements in this Complaint are further based on your **Complainant's** review of telephone toll records and pen registers, physical surveillance, police reports, and on my experience and training.

3.     During the past several years, the FBI, along with other law enforcement agencies, have conducted a criminal investigation concerning the **Bandido Outlaw Motorcycle Gang (BOMG)** and other motorcycle gangs affiliated with the **BOMG,** referred to as "support clubs." For purposes of this Complaint, these criminal associates will be referred to as **BOMG,** collectively. Specifically, this investigation has targeted the illegal conspiracy by these organizations to possess, with the intent to distribute, illicit drugs and weapons.

4.     In late 2009, an **FBI Undercover Employee (UCE-1)** was introduced to members of the **BOMG** and their **BOMG** affiliates. Following this introduction, **UCE-1** was able to finance a motorcycle repair shop (hereafter referred to as "the shop"). The shop was used as an evidence and intelligence collection gathering platform against predicated members of the **BOMG**. After the shop was opened, **UCE-1** was able to form a criminal relationship with a patched **BOMG** member who agreed to supply **UCE-1** large quantities of methamphetamine for redistribution in order to further fund the shop. After several sales of methamphetamine to **UCE-1**, the **BOMG** member expressed a desire to speak to federal authorities regarding his criminal activity, as well as a desire to

leave the **BOMG**. The subject confided to **UCE-1** that he was willing to work with federal authorities in exchange for consideration by the government in showing him some form of leniency for his past criminal acts. Following that conversation, **UCE-1** was able to facilitate a meeting between the subject and your **Complainant** on or about July 1, 2010. At that meeting, the subject agreed to work for the FBI as a **Cooperating Defendant** (hereafter referred to as **CD-1**). **CD-1** was not made any promises of leniency for his cooperation. For clarity, the subject will be referred to as **CD-1** throughout the document, even though he did not agree to work for the FBI until July 1, 2010.

5. On or about December 16, 2009, **CD-1** attempted to facilitate the sale of approximately fifteen (15) ounces of methamphetamine at the request of **UCE-1**. The transaction was arranged by **CD-1**, wherein **Morgan Clifford Wood**, also known as Roca Mick, (**Wood**) would sell **UCE-1** and a **Cooperating Source** (hereafter referred to as **CS-1**) the methamphetamine. **Wood** is a member of **LA ROCA OMG**, a **BOMG** support club. At that time, **Wood** was more familiar with **CS-1**; thus, the initial conversations negotiating the deal were between **Wood** and **CS-1**. Also, at that time, **CD-1** only facilitated the deal with **Wood** based on the understanding that he would receive some financial benefit and a portion of the methamphetamine once the transaction was completed.

During conversations with **CS-1**, **Wood** indicated that he wanted $12,000.00 in exchange for the 15 ounces of methamphetamine. During further negotiations, **Wood** stated to **CS-1** that he had misunderstood the price being charged by the actual owner of the methamphetamine and clarified that the actual price for 15 ounces would be $32,000.00, due to the drugs' high level of purity. **UCE-1** informed **Wood** that the drug price was absurdly high and declined to transact the deal.

**UCE-1** later telephoned **CS-1** and asked if **Wood** would be willing to sell four (4) ounces of methamphetamine at a reasonable price. **Wood** told **CS-1** that **UCE-1** had to buy the whole 15 ounces of methamphetamine or none at all because the owner did not want to apportion it from the whole amount.

Later, **Wood** told **CS-1** that he would sell **UCE-1** eight (8) ounces of methamphetamine for $10,000.00, which **CS-1** relayed to **UCE-1**. **UCE-1** agreed to the price and asked **Wood** to meet with him. **Wood** told **UCE-1** that he needed to get the money in advance so that he could retrieve the methamphetamine from its owner. **UCE-1** did not agree to those terms and terminated negotiations.

**UCE-1** later telephoned **CS-1** and requested that **CS-1** ask **Wood** if **Wood** would be willing to accept $15,000.000 for all 15 ounces of methamphetamine, and then

allow **UCE-1** two to three days to obtain another $15,000.00 in order to complete payment for the methamphetamine. **Wood** agreed to the deal, but again wanted **UCE-1** to provide him with the money first. **UCE-1** informed **Wood** that he would not front the money to **Wood** for any reason for any period of time. **Wood** asked **UCE-1** if he would be willing to come to Arlington, Texas to meet with him at a location closer to where the methamphetamine was located so that **Wood** could get the methamphetamine, then exchange it with **UCE-1** for cash. **UCE-1** agreed to this arrangement. **Wood** asked **UCE-1** to meet him at the *Why Not Bar*, located in Arlington, Texas, and to bring **CS-1** to the transaction because **CS-1** had the only phone number that **Wood** knew to call. **UCE-1** agreed and told **Wood** that he would meet with him at the location in Arlington, Texas.

**UCE-1** and **CS-1** arrived at the bar and waited for **Wood** to arrive. **Wood** later arrived with a second male, identified as **James Paul Pope**, also known as **Pokey (Pope)**. **Pope** went inside the bar and **Wood** got into **UCE-1's** vehicle. After introductions were made, **Wood** asked **UCE-1** if he could verify that **UCE-1** had the cash to purchase the methamphetamine. **UCE-1** showed **Wood** the cash, then **Wood** invited **UCE-1** and **CS-1** inside the bar to have a beer. **UCE-1** declined, stating that he wanted to go get something to eat. **Wood** gave **UCE-1** directions to a restaurant where **UCE-1** and the **CS-1** could go and eat. After **UCE-1** and **CS-1** departed the bar, **Wood** went inside the bar.

**UCE-1** and **CS-1** later returned to the bar to complete the transaction. **Wood** and **Pope** came outside the bar and got into **UCE-1's** vehicle. **Wood** and **Pope** asked **UCE-1** and **CS-1** to come to **Pope's** house to complete the transaction. After several minutes of negotiations, **UCE-1** declined and ultimately terminated the negotiations out of safety concerns. **UCE-1** and **CS-1** then left the bar.

Telephone analysis confirmed that there was cellular telephone contact between **Wood** and **Pope** during the negotiations. Additionally, there was cellular telephone contact between **Pope** and a cellular telephone subscribed to **Danny Moore** [**Daniel Patrick Moore** also known as **Danny (Moore)**] during the negotiations.

**Moore** has been identified as a member of the Boozefighters Motorcycle Gang, an affiliate club of the **BOMG**. In late 2006 and 2007, **Moore** was the subject of a North Richland Hills Police Department/Tarrant County Task Force investigation wherein **Moore** was suspected of selling illicit drugs. On June 22, 2007, based on that investigation, a search warrant was executed at **Moore's** residence. **Moore** was present during the search of his residence. During the search, 8.1 grams of suspected methamphetamine, five sets of scales, and a Taurus 9mm handgun were located inside the

residence. A search of **Moore's** vehicle yielded an additional 5.9 grams of suspected methamphetamine, as well as a KelTec 9mm pistol.

During an interview, **Moore** indicated that the suspected methamphetamine and two firearms located during the search belonged to him. **Moore** also indicated that he had a storage facility that contained additional methamphetamine. **Moore** took investigators to the storage facility and showed them two bags which contained 3 ½ pounds of suspected methamphetamine. Investigators also discovered six (6) additional handguns during the search, all of which were seized. **Moore** was charged with Possession of a Controlled Substance and subsequently sentenced to seven (7) years probation-deferred.

6.    On January 22, 2010, **UCE-1** met with **CD-1** to discuss the pending opening of the shop. The meeting was held in order to discuss any potential problems or misunderstandings between **UCE-1** and **CD-1**, to include the 15-ounce methamphetamine attempted purchase involving **Wood, CS-1**, and **Pope**. During the conversations, **CD-1** indicated that the transaction had made him nervous due to the fact that **CS-1** had not told him that **UCE-1** was going to be involved in the purchase and due to the high volume of methamphetamine that was going to be sold. **CD-1** further stated that even though he had facilitated the deal with **Wood**, he did not want to be directly involved because he did not want to go to jail if everyone got caught.

**CD-1** asked what had happened during the failed transaction. **UCE-1** provided him with an explanation and summary of what had transpired. **CD-1** stated that he had been disappointed that the transaction did not happen, as the money that **UCE-1** was going to pay for the methamphetamine was going to be used by him and **Wood** as "Christmas money." **CD-1** also stated that he was going to be given one ounce of the original total of sixteen (16) ounces of methamphetamine for arranging the deal.

7.    On March, 4, 2010, **CD-1** and **UCE-1** were located at the shop. **CD-1** and **UCE-1** left the shop in **UCE-1's** vehicle. During the drive, **CD-1** asked **UCE-1** to disable his cellular telephone so that the pair could talk openly. This practice is customary for **BOMG** members, as they believe law enforcement can enable their telephones to be used as listening devices. **UCE-1** gave **CD-1** his telephone and **CD-1** took the battery out of it. **CD-1** asked that, because the shop was costing so much money to get started, would **UCE-1** be willing to buy pound quantities of methamphetamine for $5,000.00 per pound, sell the methamphetamine to his own customer base, then reinvest the profits back into the shop.

UCE-1 asked CD-1 generally about the low cost of the methamphetamine, its purity, the risk, the suppliers, and CD-1's fee for the delivery. CD-1 explained that he would be getting the methamphetamine from the same suppliers that UCE-1 had dealt with before, meaning Pope and Wood. CD-1 indicated that he had already told the suppliers that the methamphetamine was for the man purportedly above UCE-1 in the hierarchy. CD-1 stated that the methamphetamine was of very high quality and estimated it to be approximately 80 percent pure. The methamphetamine was kept at a compound-like residence somewhere in Arlington, Texas and that he (CD-1) would have to obtain the money from UCE-1, drive to the residence to pay for the methamphetamine, then deliver it to UCE-1. CD-1 stated that according to the suppliers, they would be able to sell two-to-four pounds of methamphetamine per month to UCE-1. UCE-1 agreed to the terms outlined by CD-1.

8.     On March 10, 2010, CD-1 met with UCE-1 at the shop in order to complete the purchase of one pound of methamphetamine for $4,700.00. After obtaining $4,700.00 in FBI drug purchase money from UCE-1, CD-1 departed the shop in order to meet with Wood and Pope. Shortly after leaving the shop, UCE-1 and CD-1 engaged in several short text messages and a telephone conversation between each other. During the exchanges, CD-1 explained that he had been confused about the price and that one pound of methamphetamine would cost $27,000.00. UCE-1 told CD-1 to purchase what methamphetamine he could with the money he had been given. CD-1 later returned to the shop with approximately 2.5 ounces of methamphetamine, which was provided to UCE-1. CD-1 then showed UCE-1 a small piece of paper on which were written prices for methamphetamine for future purchases:

> One (ounce) costs $1,700.00;
> Eight ounces cost $13,600.00;
> One pound costs $27,000.00.

DEA testing confirmed that the substance purchased by UCE-1 was methamphetamine with a net weight of 67.4 grams with a 77.3 percent purity.

Telephone analysis confirmed that there was cellular telephone contact between Wood and Pope during the transaction. Additionally, there was cellular telephone contact between Pope and Moore during the transaction.

9.     On March 21, 2010, UCE-1 arranged a four (4) ounce methamphetamine purchase for $6,800.00 with CD-1 to be completed the following day (March 21, 2010).

On March 22, 2010, **UCE-1** met **CD-1** at the shop and provided him with $6,800.00 in FBI drug purchase money in order for **CD-1** to purchase four ounces of methamphetamine. Prior to departing the shop, **CD-1** contacted someone on his cellular telephone and asked what the cross streets were at the individual's location. The male could be heard by **UCE-1** to say "Collins and Abram." **CD-1** then departed the shop. **Pope's** residence is in close proximity to this intersection.

Surveillance units followed **CD-1** from the shop to **Pope's** residence. In the front of **Pope's** residence was a silver and red GMC Suburban registered to **Pope**. **CD-1** went inside the residence. A short time later, **Pope** left his residence in the GMC Suburban. A few of the surveillance units remained at **Pope's** residence and some followed **Pope** in the GMC Suburban.

Surveillance followed **Pope** to an address located in Hurst, Texas that was identified as **Moore's** residence. Surveillance units obtained a license plate on a red 2003 Pontiac Grand Am. The vehicle was registered to a female, believed to reside with **Moore.**

**Pope** stayed at **Moore's** residence a short time, then returned to **Pope's** residence. A short time later, **CD-1** departed **Pope's** residence and delivered approximately four ounces of methamphetamine to **UCE-1** at the shop.

DEA testing confirmed that the substance was methamphetamine with a net weight of 106.3 grams with a 74.5 percent purity.

Telephone analysis confirmed that there was cellular telephone contact between **CD-1** and **Pope** during the transaction. Additionally, there was cellular telephone contact between **Pope** and **Moore** during the transaction.

10.     On April 14, 2010, **UCE-1** and **CD-1** met at the shop in order to complete a four-ounce methamphetamine purchase previously negotiated by the pair. **UCE-1** provided **CD-1** with $6,800.00 in FBI drug purchase money in order to complete the transaction. **CD-1** then left the shop.

**CD-1** left the shop and traveled to **Pope's** residence. Surveillance units observed **CD-1** and **Pope** talking in the front yard of **Pope's** residence. **CD-1** remained at the residence a short period of time, then returned to the shop where he delivered approximately four (4) ounces of methamphetamine to **UCE-1**. A few of the surveillance units followed **CD-1** and some continued the surveillance of **Pope**.

DEA testing confirmed that the substance purchased by **UCE-1** was methamphetamine with a net weight of 104.1 grams with a 92.7 percent purity.

Shortly after **CD-1** left **Pope's** residence, **Pope** was observed on a motorcycle departing his residence. Surveillance units followed **Pope** from his residence to **Moore's** residence. The garage door of the residence was open and surveillance observed **Pope** meet with a second white male, believed to be **Moore,** inside the garage. After **Pope** was inside the garage, the garage door was closed.

It is the belief of investigators that **Pope** had already obtained the methamphetamine from **Moore** in anticipation of the purchase. Further, after obtaining the money from **CD-1**, **Pope** went to pay **Moore** for the methamphetamine.

Telephone analysis confirmed that there was cellular telephone contact between **CD-1** to and **Pope** during the transaction. Additionally, there was cellular telephone contact between **Pope** and **Moore** during the transaction.

11. On October 11, 2010, surveillance units observed **Moore** departing **Moore's** residence driving the previously mentioned Pontiac Grand Am. **Moore** was accompanied by a white female.

[In the drug purchase transactions detailed above, **CD-1** was *not* working at the direction of the FBI. During debriefings of **CD-1**, following his agreement to work at the behest of FBI on July 1, 2010, **CD-1** stated he had initially gone through **Wood** to purchase methamphetamine from **Pope**; however, after a few purchases, **CD-1** "cut" **WOOD** out of the purchases and went directly to **Pope**.]

12. On November 1, 2010, at approximately 1:17 p.m., **CD-1** went to **Pope's** residence in order to discuss the pending purchase of approximately two (2) ounces of methamphetamine from **Pope**. [This purchase was the first purchase of methamphetamine from **Pope** wherein **CD-1** was directed by the FBI.]

During the discussion, **Pope** indicated that he did not have the methamphetamine at his residence and he would have to contact his source of supply. In **CD-1's** presence, **Pope** made a cellular telephone call to his source of supply of methamphetamine. Following the conversation, **Pope** indicated that his source of supply would have the methamphetamine in one or two days. Telephone analysis indicated that **Pope** made an outgoing cellular telephone call at approximately 1:17 p.m. on November 1, 2010, to a cellular telephone believed to be used by **Moore**. It is the belief of

investigators, based on this call and the controlled purchase detailed below, that **Pope** contacted **Moore** on this number to facilitate the sale of the requested methamphetamine.

On November 2, 2010, **Pope** contacted **CD-1** and indicated that he had the methamphetamine in his possession. Following the call, surveillance followed **CD-1** from the shop to **Pope's** residence. Once at **Pope's** residence, **CD-1** went inside the residence where he provided **Pope** with $3,400.00 in FBI drug purchase money in exchange for approximately two ounces of methamphetamine. **Pope** provided **CD-1** with the methamphetamine. Following the transaction, **CD-1** left **Pope's** residence and delivered approximately two ounces of methamphetamine to **UCE-1**.

Shortly after **CD-1** left, **Pope** exited his residence, got into a black El Camino, then left the residence. Surveillance units lost sight of **Pope** shortly after he departed his residence. Approximately one hour after surveillance lost **Pope**, **Pope** arrived at **Moore's** residence in a red and white GMC Suburban, previously observed on surveillance.

DEA testing confirmed that the substance purchased by **UCE-1** was methamphetamine with a net weight of 51.3 grams with a 82.5 percent purity.

Telephone analysis confirmed that there was cellular telephone contact between **CD-1** and **Pope** during the transaction. Additionally, there was cellular telephone contact between **Pope** and a cellular telephone believed to be utilized by **Moore** during the transaction.

13. On January 12, 2011, **CD-1** facilitated the purchase of two ounces of methamphetamine from **Pope**. Prior to the purchase, **UCE-1** provided **CD-1** with $3,400.00 in FBI drug purchase money to complete the transaction. After being provided with the money, surveillance followed **CD-1** from the shop to **Pope's** residence.

After a short period inside **Pope's** residence, **CD-1** departed the residence and met with **Complainant**. **CD-1** provided **Complainant** with approximately two ounces of suspected methamphetamine. Additional surveillance units maintained surveillance on **Pope's** residence. A few minutes after **CD-1** departed, **Pope** got into a red Jeep Wrangler. **Pope** departed the residence in the red Jeep and traveled to **Moore's** Residence.

DEA testing confirmed that the substance purchased by **UCE-1** was methamphetamine with a net weight of 51.1 grams with a 77.6 percent purity.

Telephone analysis confirmed that there was cellular telephone contact between **CD-1** and **Pope** during the transaction. Additionally, there was cellular telephone contact between **Pope** and a cellular telephone believed to be utilized by **Moore** during the transaction.

Based on the foregoing, the **Complainant** believes that probable cause exists that **Daniel Patrick Moore**, also known as Danny, **James Paul Pope,** also known as Pokey, and **Morgan Clifford Wood,** also known as Roca Mick**,** have committed offenses involving violations of Title 21, United States Code, Section 841(a)(1)(Possession of a Controlled Substance with the Intent to Distribute); United States Code, Section 846 (Conspiracy to Possess with Intent to Distribute a Controlled Substance); and Title 18, United States Code, Section 2 (Aiding and Abetting the above-described offenses).

J. Ray Harrison, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence, September **2/** , 2011, at Fort Worth, Texas, at **4:30** o'clock, p.m.

**HONORABLE JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE**

**Moore Complaint - Page 10**